Jennifer Swain et al.              :

v.                         :

Estate of Shelley Tyre             :
by and through James H. Reilly     :
  as Administrator d.b.n, c.t.a.   :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2009-297-Appeal.
(NP 08-0405)
Dissent begins on page 16

|  |  |
|---|---|
| Jennifer Swain et al. | : |
|  |  |
| v. | : |
|  |  |
| Estate of Shelley A. Tyre | : |
| by and through James H. Reilly | : |
| as Administrator d.b.n., c.t.a. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.**  Before this Court is a question of first impression.  We are called upon to determine whether the Rhode Island Slayer's Act, G.L. 1956 chapter 1.1 of title 33 (Slayer's Act, or Act), prohibits the testatrix's stepchildren, Jennifer and Jeremy Swain (plaintiffs), from inheriting as named contingent testamentary beneficiaries (contingent beneficiaries) because this inheritance would confer a benefit on their father, David Swain (David).  David, a slayer pursuant to the Act, has been adjudicated responsible for intentionally causing the death of the testatrix, Shelley Arden Tyre (Shelley).[1]

The plaintiffs appeal from a grant of summary judgment in favor of defendant, Estate of Shelley A. Tyre (Estate or defendant), holding that they were barred as a matter of law from inheriting under the Slayer's Act.  This case came before the Supreme Court for oral argument on September 20, 2012,[2] pursuant to an order directing the parties to appear and show cause why

---

[1] This Court means no disrespect to the parties by referring to them by their first names.  It is for clarity purposes only that first names are used throughout this opinion.

[2] The extended travel in this Court is discussed more fully below.

-1-

the issues raised in this appeal should not be summarily decided. After reviewing the record and considering the written and oral submissions of the parties, we are satisfied that this appeal may be resolved without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

The essential facts of this case are not in dispute. Shelley executed the will in question on October 5, 1993, in contemplation of her marriage to David.[3] She married David shortly thereafter. Her will named David as the sole beneficiary of her estate. She also specifically named both Jennifer and Jeremy Swain as the only contingent beneficiaries under her will. They stood to inherit in the event that David predeceased her.[4]

Shelley's untimely death by drowning in 1999 triggered the administration of her estate.[5] Pursuant to her will, David was named as the executor. However, this role was short-lived. On May 1, 2002, after first bringing a wrongful-death claim against David in the Newport County Superior Court, Shelley's parents filed a petition in the Jamestown Probate Court to remove David as executor. The probate judge granted the petition on July 3, 2002, removed David as executor, and then appointed James H. Reilly (Reilly or administrator)[6] as the administrator

---

[3] The Estate notes that Shelley and David also executed a prenuptial agreement on the same day that Shelley executed her will. Pursuant to the prenuptial agreement, neither Shelley nor David would have a right to either party's assets or any alimony upon divorce.

[4] Clause III of Shelley's Last Will and Testament reads as follows: "I give all my tangible personal property to my husband, or if he is not living thirty (30) days after my death, then in substantially equal shares to such of my husband's children, Jennifer Swain and Jeremy Swain (hereinafter 'my husband's children'), as are then living."

[5] On March 12, 1999, Shelley died while scuba diving with David off the coast of Tortola in the British Virgin Islands.

[6] James H. Reilly currently remains the administrator d.b.n., c.t.a., of Shelley's estate.

d.b.n., c.t.a., of Shelley's estate. Additionally, the probate judge ordered David to return the sum of $152,568.19, which the probate court deemed he had wrongfully taken from the estate.[7]

As noted above, on March 5, 2002, Shelley's parents brought a wrongful-death action against David alleging that he (1) was a slayer pursuant to § 33-1.1-1(3); (2) caused Shelley's wrongful death; and (3) should be subject to civil liability for a criminal act, pursuant to G.L. 1956 § 9-1-2. After a trial, held in February of 2006, a jury returned a verdict in favor of Shelley's parents on all three counts, finding that David "intentionally * * * killed Shelley with malice aforethought" and that he therefore met the definition of slayer set forth in the Slayer's Act.[8] Shelley's parents were awarded compensatory damages in the amount of $2,815,085.46, as well as punitive damages totaling $2 million. After the trial justice denied his motion for a new trial, David appealed to this Court. On May 13, 2008, we affirmed the lower court ruling, holding that "once the Superior Court has made a declaration * * * with respect to whether a defendant is a slayer it is then within the province of the probate court to determine what effect, if any, that declaration has on the distribution of the decedent's assets under a will or other instrument." Tyre v. Swain, 946 A.2d 1189, 1198 (R.I. 2008).

Thereafter, on May 20, 2008, Reilly filed a petition in the Jamestown Probate Court to construe the will in light of this Court's decision.[9] On June 27, 2008, the probate judge issued a written order declaring that "[n]either David A. Swain, nor his heirs at law, shall receive directly

---

[7] This sum was never paid. As we note below, it was later discharged in the United States Bankruptcy Court for the District of Rhode Island.

[8] Section 33-1.1-1(3) states that a slayer is "any person who willfully and unlawfully takes or procures to be taken the life of another."

[9] Reilly previously had filed a petition with the probate court in 2006 after David was adjudged a slayer in the Superior Court. However, that petition was stayed pending David's appeal to this Court.

or indirectly from the Estate of Shelley Arden Tyre." Accordingly, based on that order, Jennifer and Jeremy were precluded from inheriting under Shelley's will as contingent beneficiaries.

The plaintiffs timely appealed the probate order to the Newport County Superior Court, arguing that the Slayer's Act did not bar them from taking their share under Shelley's will. They contended that since they were specifically named as contingent beneficiaries, they therefore were not inheriting "through" their father, as would otherwise be prohibited by the Slayer's Act. In opposition, the Estate maintained that allowing Jennifer and Jeremy to inherit would, in fact be, a benefit to David, in direct violation of the Slayer's Act.[10] According to the Estate, the Legislature "intended both a broad interpretation and discretion to determine when a slayer will benefit by either taking directly or indirectly as a result of the death of the decedent."

On cross-motions for summary judgment, the hearing justice found in favor of the Estate, holding that the Slayer's Act barred Jennifer and Jeremy from inheriting under Shelley's will. Referring to § 33-1.1-15, which prescribes that the Slayer's Act be interpreted "broadly to effectuate the policy of this State that no person shall be allowed to profit from his or her wrongs," the hearing justice determined that "allow[ing] Jennifer and Jeremy to take [under Shelley's will]" would directly violate the Act because their inheritance would improperly allow "the slayer David Swain [to] profit from his wrongdoing." Of import, the hearing justice noted that Jennifer and Jeremy were not minors, and therefore "ha[d] the ability to control the distribution of the property that * * * they would be entitled to if permitted by this action." With that in mind, the hearing justice based his decision to bar plaintiffs' taking under Shelley's will on the undisputed facts that: (1) Jeremy had personally contributed and raised money to finance

---

[10] Section 33-1.1-2 states that "[n]either the slayer nor any person claiming through him or her shall in any way acquire property or receive any benefit as the result of the death of the decedent * * *."

-4-

his father's defense;[11] and (2) Jennifer and Jeremy had both stated that they would use any proceeds they inherited from Shelley's estate for their father's criminal defense, if necessary.

The plaintiffs then filed a notice of appeal to this Court.[12] On appeal, they contend that the trial justice erred in determining that the bequest to Jennifer and Jeremy under Shelley's will violated the Slayer's Act. Furthermore, they maintain that the Slayer's Act does not bar them from taking under Shelley's will since they were specifically named as contingent beneficiaries and are therefore not "claiming through" David.

At the oral argument held on October 3, 2011, issues concerning mootness emerged. This Court deferred consideration of the merits of the appeal and issued an order directing the parties to file a joint statement as to whether the judgment of the Jamestown Probate Court (holding David responsible for paying the Estate $152,568.19) had been discharged in bankruptcy. Pursuant to our order, the parties submitted a joint statement confirming that the entire judgment had, in fact, been discharged in bankruptcy by the United States Bankruptcy Court for the District of Rhode Island. In this joint statement, the parties also indicated that approximately $5,571.99 remained in the estate for distribution.

Thereafter, on October 21, 2011, we issued an order referring this matter to the Supreme Court Appellate Mediation Program for resolution. In the event that mediation failed, the order directed the parties to file additional briefs with this Court as to whether a justiciable controversy remained.

---

[11] At the time, David was convicted of murder for Shelley's death in the British Virgin Islands. This conviction has since been overturned. David Swain and the Queen, HCRAP 2008/09, (B.V.I. Sept. 29, 2011).

[12] Following a prebriefing conference, this Court issued an order remanding the case to Superior Court for the entry of final judgment. The order further specified that, thereafter, the file would be assigned to the regular calendar for full briefing and argument. The later entry of final judgment thereby cured the defect in the premature appeal. Merrimack Mutual Fire Insurance Co. v. Dufault, 958 A.2d 620, 623 n.4 (R.I. 2008).

After an unsuccessful attempt to resolve this case through mediation, the parties submitted additional briefs addressing the issue of mootness, pursuant to our order. On May 2, 2012, we issued a subsequent order assigning the case to the show-cause calendar, and we indicated that the parties "may file additional memoranda, if so desired, in order to address any supplementary issues that may have arisen since the date of their last appearance before this Court."[13] (Emphasis added.)

## II

## Standard of Review

"It is well established that this Court reviews a trial justice's grant of summary judgment de novo." Beacon Mutual Insurance Co. v. Spino Brothers, Inc., 11 A.3d 645, 648 (R.I. 2011) (citing Sansone v. Morton Machine Works, Inc., 957 A.2d 386, 393 (R.I. 2008)). "Summary judgment is appropriate when no genuine issue of material fact is evident from 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any,' and the motion justice finds that the moving party is entitled to prevail as a matter of law." Id. (quoting National Refrigeration, Inc. v. Travelers Indemnity Co. of America, 947 A.2d 906, 909 (R.I. 2008)); see also Rule 56(c) of the Superior Court Rules of Civil Procedure.

Additionally, this Court conducts a de novo review of a trial justice's ruling concerning the interpretation of a statute. State v. Marsich, 10 A.3d 435, 440 (R.I. 2010) (citing State v.

---

[13] In its supplemental brief, the Estate raises the novel issue of whether Shelley's publicity rights, if any, survive her death and therefore are inheritable. However, the Estate could have raised this issue below and failed to do so. It is well settled that "this Court's 'raise-or-waive' rule precludes our consideration of an issue that has not been raised and articulated [below]." State v. Bido, 941 A.2d 822, 828 (R.I. 2008). We note that our order on May 2, 2012, did not provide a free pass to avoid the raise-or-waive rule. As such, we will not address this issue on appeal. See Article I, Rule 16(a) of the Supreme Court Rules of Appellate Procedure ("Errors not claimed, questions not raised and points not made ordinarily will be treated as waived and not be considered by th[is] Court.").

Burke, 811 A.2d 1158, 1167 (R.I. 2002)).  "It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings."  Waterman v. Caprio, 983 A.2d 841, 844 (R.I. 2009) (quoting Iselin v. Retirement Board of the Employees' Retirement System of Rhode Island, 943 A.2d 1045, 1049 (R.I. 2008)).  As such, "[t]he Legislature is presumed to have intended each word or provision of a statute to express a significant meaning, and the [C]ourt will give effect to every word, clause, or sentence, whenever possible."  State v. Clark, 974 A.2d 558, 571 (R.I. 2009) (quoting State v. Bryant, 670 A.2d 776, 779 (R.I. 1996)).

However, "[t]his [C]ourt will not construe a statute to reach an absurd result."  Long v. Dell, Inc., 984 A.2d 1074, 1081 (R.I. 2009) (quoting Shepard v. Harleysville Worcester Insurance Co., 944 A.2d 167, 170 (R.I. 2008)).  Further, "[a] statute * * * may not be construed in a way that would * * * defeat the underlying purpose of the enactment."  Brennan v. Kirby, 529 A.2d 633, 637 (R.I. 1987) (citing City of Warwick v. Aptt, 497 A.2d 721, 724 (R.I. 1985)).  "[O]ur ultimate goal is to give effect to the purpose of the act as intended by the Legislature."  Webster v. Perrotta, 774 A.2d 68, 75 (R.I. 2001) (citing Matter of Falstaff Brewing Corp. Re: Narragansett Brewery Fire, 637 A.2d 1047, 1050 (R.I. 1994)).

### III

### Discussion

### A

### Justiciability

Before considering the merits of the parties' arguments, this Court must first address the threshold issue of justiciability.  See City of Cranston v. Rhode Island Laborers' District Council, Local 1033, 960 A.2d 529, 533 (R.I. 2008).  "For a claim to be justiciable, two

elemental components must be present: (1) a plaintiff with the requisite standing and (2) 'some legal hypothesis which will entitle the plaintiff to real and articulable relief.'" N&M Properties, LLC v. Town of West Warwick, 964 A.2d 1141, 1145 (R.I. 2009) (quoting Bowen v. Mollis, 945 A.2d 314, 317 (R.I. 2008)).

This Court has consistently held that "[a]s a general rule we only consider cases involving issues in dispute; we shall not address moot, abstract, academic, or hypothetical questions." Morris v. D'Amario, 416 A.2d 137, 139 (R.I. 1980). Moreover, we "long ha[ve] recognized the need, apart from certain exceptional circumstances, to confine judicial review only to those cases that present a ripe case or controversy." City of Cranston, 960 A.2d at 533 (citing State v. Lead Industries, Inc., 898 A.2d 1234, 1238 (R.I. 2006)). Accordingly, "[a]n appeal is moot," and therefore not properly before this Court, "when 'a decision by this [C]ourt on the merits [would] not have a practical effect on the underlying controversy.'" Town Houses at Bonnet Shores Condominium Association v. Langlois, 45 A.3d 577, 581 (R.I. 2012) (quoting Campbell v. Tiverton Zoning Board, 15 A.3d 1015, 1021 (R.I. 2011)). Furthermore, when "later events deprive the litigants of an ongoing personal stake in the controversy, the action is moot" and is not reviewable by this Court. Campbell, 15 A.3d at 1022 (quoting Sullivan v. Chafee, 703 A.2d 748, 753 (R.I. 1997)).

After careful consideration, we hold that the issue before us is justiciable. The plaintiffs' claim—asserting that they are entitled to inherit as contingent beneficiaries under Shelley's will—alleges an "injury in fact" sufficient to meet this Court's justiciability requirement.[14] See Rhode Island Ophthalmological Society v. Cannon, 113 R.I. 16, 22, 317 A.2d 124, 128 (1974). Although only $5,571.99 remains in the estate for distribution, the claim is nonetheless "concrete

---

[14] Although not relevant to our holding on mootness, we note that both parties have urged this Court to render a decision on the merits, steadfastly contending that the appeal is not moot.

-8-

and particularized * * * and * * * actual or imminent, not 'conjectural' or 'hypothetical.'" McKenna v. Williams, 874 A.2d 217, 226 (R.I. 2005) (quoting Pontbriand v. Sundlun, 699 A.2d 856, 862 (R.I. 1997)).

Moreover, it is well settled that the line demarcating the standard for mootness "is not between a substantial injury and an insubstantial injury. The line is between injury and no injury." McKenna, 874 A.2d at 226 (quoting Pontbriand, 699 A.2d at 862)). Here, plaintiffs contend that they are entitled to assets from the estate as contingent beneficiaries under Shelley's will. This Court's judgment would therefore have a "practical effect on the existing controversy," which enables us to render an opinion on the matter. City of Cranston, 960 A.2d at 533. We are thus satisfied that the issue before us is justiciable.

**B**

**The History and Policy Rationale of the Slayer's Act**

To aid in our analysis, we briefly examine the history and policy rationale of the Slayer's Act. The notion that a person should not profit or benefit from his or her own wrong derives from the common law. The axiom was incorporated in the doctrines of attainder, forfeiture of estate, and corruption of blood.[15] See Tara L. Pehush, Maryland is Dying for a Slayer Statute: The Ineffectiveness of the Common Law Slayer Rule in Maryland, 35 U. Balt. L. Rev. 271 (2005); Karen J. Sneddon, Should Cain's Children Inherit Abel's Property?: Wading Into the Extended Slayer Rule Quagmire, 76 UMKC L. Rev. 101, 104 (2007). Together, these doctrines

---

[15] "Attainder" is "the act of extinguishing a person's civil rights when sentenced to death or declared an outlaw for committing a felony or treason." Black's Law Dictionary 123 (7th ed. 1999). "Forfeiture" is "[t]he loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty." Id. at 661. "Corruption of blood" is a doctrine pursuant to which "a person loses the ability to inherit or pass property as a result of an attainder or of being declared civilly dead." Id. at 348.

prohibited a slayer and his or her heirs from receiving property under the distribution of a victim's estate.

The United States Constitution later substantially abolished these common-law doctrines;[16] however, the premise that no person shall benefit from his or her own wrongdoing endured. In the late nineteenth century, the United States Supreme Court addressed the inheritance rights of a slayer and his issue. See New York Mutual Life Insurance Co. v. Armstrong, 117 U.S. 591 (1886). In that case, an insurance company refused to pay the victim's policy proceeds to the slayer's estate, even though the victim's policy explicitly stated that the policy proceeds were payable to the slayer. Relying on the maxim that no person shall benefit from his own wrong, the Court held that the slayer's estate was barred from collecting the proceeds of the victim's insurance policy, even though the estate's beneficiaries consisted of potentially innocent heirs. Id. at 600. The Court stated:

> "[I]ndependently [sic] of any proof of the motives of [the slayer] in obtaining the policy, and even assuming that they were just and proper, he forfeited all rights under it when, to secure its immediate payment, he murdered the assured. It would be a reproach to the jurisprudence of the country, if one could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had willfully fired." Id.

Later, New York's highest court disqualified a slayer from inheriting under the decedent's will, declaring:

> "What could be more unreasonable than to suppose that it was the legislative intention in the general laws passed for the orderly, peaceable, and just devolution of property that they should have operation in favor of one who murdered his ancestor that he might speedily come into the possession of his estate?" Riggs v. Palmer, 22 N.E. 188, 190 (N.Y. 1889).

---

[16] United States Constitution Art. III, sec. 3, cl. 2 ("[N]o attainder of treason shall work corruption of blood, or forfeiture except during the life of the person attainted.").

-10-

Today, the vast majority of states have adopted some form of a slayer statute, thereby further entrenching the principle that no person shall benefit from the killing of another.[17] Having enacted its own slayer statute in 1962, Rhode Island is no exception.

The Slayer's Act provides in part that "[n]either the slayer nor any person claiming through him or her shall in any way acquire any property or receive any benefit as the result of the death of the decedent, but the property shall pass as provided in this chapter."  G.L. 1956 § 33-1.1-2.  A slayer is defined under the statute as "any person who willfully and unlawfully takes or procures to be taken the life of another."  Section 33-1.1-1(3).  When the slayer is named as a beneficiary in the decedent's will, "[t]he slayer shall be deemed to have predeceased the decedent as to property which would have passed to the slayer by devise or legacy from the decedent, except that the provisions of G.L. 1956 § 33-6-19[18] [the anti-lapse statute] shall not apply."  Section 33-1.1-4.  Additionally, the Act precludes a slayer from inheriting an intestate or spousal share, thereby also precluding the slayer's issue from such inheritance.  Section 33-1.1-3.

### C

### Arguments of the Parties

The plaintiffs contend that the Slayer's Act does not preclude them from inheriting under Shelley's will as named contingent beneficiaries.  The language of the Slayer's Act explicitly states that a person "<u>claiming through</u>" the slayer is prohibited from "acquir[ing] any property or

---

[17] <u>See</u>, e.g., Cal. Prob. Code § 250 (West 2002); Conn. Gen. Stat. Ann. § 45a-447 (West 2004); Del. Code Ann. tit. 12, § 2322 (2007); Fla. Stat. Ann. § 732.802 (West 2010); Me. Rev. Stat. Ann. tit. 18-A, § 2-803 (1964); 20 Pa. Cons. Stat. Ann. §§ 8801-8815 (West 2005); Vt. Stat. Ann. tit. 14, § 322 (2009); Va. Code Ann. § 64.2-2501(2012).

[18] General Laws 1956 § 33-6-19 provides that a gift does not lapse if the beneficiary predeceases the testator; instead, the gift passes to the issue of the predeceased beneficiary.  Conversely, pursuant to the Slayer's Act, § 33-6-19 does not apply.  Section 33-1.1-4.  Thus, the slayer's issue would be barred from inheriting in such fashion.

receiv[ing] any benefit as a result of the death of the decedent." Section 33-1.1-2 (emphasis added). Here, it is clear that plaintiffs are not claiming through the slayer. Rather, they seek their share explicitly under the terms of Shelley's will. They maintain that applying the Slayer's Act to preclude their inheritance directly contravenes Shelley's testamentary intent. They note that the Estate has never refuted plaintiffs' assertion that Shelley valued her relationship with them and that they shared a strong familial bond.

Further, plaintiffs emphasize that there is no language in the Slayer's Act specifically precluding a slayer's issue from inheriting as named contingent beneficiaries. Thus, according to plaintiffs, the Slayer's Act only applies to disinherit a slayer's issue when they have not been named as beneficiaries in the decedent's will. Additionally, they contend that the Legislature carefully drafted the Slayer's Act to strike a balance between two competing interests: the interest in prohibiting a slayer from benefitting from his or her wrongs, and the interest in carrying out the wishes of testators under the terms of their wills. As such, then, the Slayer's Act explicitly carves out language to preclude a slayer's issue from inheriting under the anti-lapse statute or through intestacy, while otherwise allowing a slayer's issue to inherit as named beneficiaries of the testator. Furthermore, plaintiffs contend that the Legislature did not intend to bar contingent beneficiaries from inheriting when such inheritance may only "indirectly" benefit a slayer.

The Estate maintains, however, that the broad language and construction of the Slayer's Act bar plaintiffs from taking under Shelley's will. The Act explicitly prohibits a slayer from "<u>in any way</u> acquir[ing] any property or receiv[ing] any benefit as the result of the death of the decedent * * *." Section 33-1.1-2 (emphasis added). Moreover, the Act states that it "shall be

-12-

construed broadly in order to effect the policy of this state that no person shall be allowed to profit by his or her own wrong." Section 33-1.1-15.

Therefore, the Estate argues, plaintiffs' taking under Shelley's will would directly contravene the Slayer's Act by conferring a benefit on David. Since the Act does not define what a benefit is, the Estate cites various dictionary definitions, which all generally define "benefit" as an advantage or a gain. The Estate points out the undisputed facts that both Jennifer and Jeremy deny their father's involvement in Shelley's death. Jeremy has contributed financially to his father's criminal defense; and both siblings have stipulated that if they are successful in this appeal, they would use any assets obtained for their father's defense, if necessary. Thus, the inclusion of the language precluding a slayer from benefiting "in any way," together with the broad construction required by the Act, operates to bar plaintiffs from inheriting as contingent beneficiaries.

Additionally, the Estate maintains that, "it is clear that [Shelley's] will was made without the benefit of knowing that [David] would kill her, and the legal fiction that he predeceased her, despite not being dead, would result in his children taking her estate." Thus, the Estate asserts that, although Jennifer and Jeremy stood to inherit under Shelley's will as contingent beneficiaries in the event that David predeceased her, she did not intend for them to inherit if David otherwise "predeceased" her by virtue of the Slayer's Act.

## D

### Analysis

In reviewing the language of the Slayer's Act, we repeat that a statute may not be construed in a way that "would defeat the underlying purpose of the enactment." Brennan, 529

A.2d at 637. "[O]ur ultimate goal is to give effect to the purpose of the act as intended by the Legislature." Webster, 774 A.2d at 75.

The Slayer's Act explicitly states that it "shall be construed broadly in order to effect the policy of this state that no person shall be allowed to profit by his or her own wrong." Section 33-1.1-15.[19] We consider this language mandating a broad construction of the Act to be crucial to our analysis. See Clark, 974 A.2d at 571 ("[T]he Legislature is presumed to have intended each word or provision of a statute to express a significant meaning, and the [C]ourt will give effect to every word, clause, or sentence, whenever possible."). "[I]t is axiomatic that 'this Court will not broaden statutory provisions by judicial interpretation unless such interpretation is necessary and appropriate in carrying out the clear intent or defining the terms of the statute.'" Iselin, 943 A.2d at 1049-50 (quoting State v. Santos, 870 A.2d 1029, 1032 (R.I. 2005) (emphasis added)). Here, the clear intent of the Slayer's Act is to ensure that a slayer does not benefit from his or her wrongdoing. Thus, although the Slayer's Act does not specifically include language barring the slayer's issue from inheriting as contingent beneficiaries, the clear and unequivocal direction of the Act requires this Court, based on the facts before us,[20] to interpret it so as to prevent the slayer from benefitting.

Here, it is undisputed that David will benefit from murdering Shelley if Jennifer and Jeremy are allowed to inherit under her will. The plaintiffs have put on the record that they

_____

[19] The Act also states that it "shall not be considered penal in nature." Section 33-1.1-15. Thus, the forfeiture under the will is not a punishment. Instead, it serves to reinforce the policy of this state that no person shall benefit from his or her own wrongdoing.

[20] We acknowledge that there may be situations in which the Slayer's Act does not apply to bar the slayer's issue from inheriting as contingent testamentary beneficiaries. For example, in the situation of a murder-suicide, the slayer is no longer living to reap the benefit of his wrongdoing. Thus, the Slayer's Act would not preclude the slayer's issue from inheriting, since such inheritance would not confer any benefit on the slayer. Similarly, there might be a factual question as to whether estranged children of the slayer, also named as contingent testamentary beneficiaries, would use such inheritance to the slayer's benefit.

would use any money from their share of the estate to finance their father's defense, if necessary.[21] They vigorously maintain that their father was not involved in Shelley's tragic death. Further, although the probate judgment of $152,568.19 against David has been discharged in bankruptcy, the outstanding multimillion-dollar civil judgment in favor of Shelley's parents remains against David for Shelley's wrongful death. It is foreseeable to conclude that plaintiffs would use assets obtained from Shelley's estate to help relieve their father's burden of satisfying this obligation.

Such a benefit to David would directly contravene both the language and the intent of the Slayer's Act. Indeed, on the facts presented, allowing plaintiffs to inherit under Shelley's will would allow David to obtain a benefit in direct contravention of the Act. Therefore, we hold that the Slayer's Act bars plaintiffs from inheriting as contingent beneficiaries.

We pause to respond to the dissent's suggestion that we have created a third category of prohibited beneficiaries not contemplated by the Slayer's Act. We have done no such thing. As stated above, § 33-1.1-2 provides that, "[n]either the slayer nor any person claiming through him or her shall in any way acquire any property or receive any benefit as the result of the death of the decedent * * *." Thus, the Act explicitly forbids a slayer from obtaining a benefit. Here, both plaintiffs have stated that they would use the assets to pay for their father's defense, if necessary. Thus, on the facts presented, there is no question that David will obtain a benefit if plaintiffs are permitted to take under Shelley's will—a result directly at odds with the express language of the Act.

---

[21] We note that although David's murder conviction has since been overturned, see supra, note 11, thereby nullifying the need for any additional funds to be spent on his criminal defense, plaintiffs have already contributed financially to their father's defense. Therefore, any share they obtain from the estate could be reimbursement for money already spent for David's benefit.

The dissent concedes that the Slayer's Act "shall be construed broadly," in accordance with the Legislature's intent. However, the dissent's own analysis applies a narrow construction of the Act. Indeed, the dissent restricts the Act's reach by concluding that it does not prohibit a slayer from receiving a benefit, provided that such benefit is "one step removed" from the death of the decedent. In so doing, the dissent ignores the explicit language of the Act which forbids a slayer from benefitting or acquiring property "in any way * * * as a result of the death of the decedent." See § 33-1.1-2 (emphasis added). Thus, the dissent's reading of the Slayer's Act is incompatible with the Legislature's mandate that the Act be construed broadly.

The dissent suggests that we have construed the Act "limitlessly" rather than broadly. We respectfully disagree with this characterization of our holding. As stated in footnote 20 of this opinion, we acknowledge that there may indeed be factual situations in which contingent beneficiaries will not confer a benefit on a slayer, and therefore are not precluded from inheriting. Noting this, we expressly limited our holding to the facts of this case, in which there is no dispute that the plaintiffs' taking under Shelley's will unquestionably would confer a benefit upon David, in direct contravention of the Slayer's Act.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court, to which we remand the record in this case.

**Justice Robinson, with whom Justice Flaherty joins, dissenting.** After no small amount of reflection concerning this admittedly challenging case, we have concluded that we

-16-

must respectfully dissent. We are unable to agree with the majority that the Slayer Act requires so broad a reading as to nullify Ms. Tyre's explicit testimonial intent.

As a general rule of statutory construction, "when the language of a statute is clear and unambiguous, the statute may not be construed or extended but must be applied literally." Citizens for Preservation of Waterman Lake v. Davis, 420 A.2d 53, 57 (R.I. 1980); see also Castelli v. Carcieri, 961 A.2d 277, 285 (R.I. 2008) ("It is not the proper role of the judiciary to bestow rights or to take them away."); Pizza Hut of America, Inc. v. Pastore, 519 A.2d 592 (R.I. 1987).

There is no ambiguity in the statute at issue. General Laws 1956 § 33-1.1-2 provides in pertinent part: "Neither the slayer nor any person claiming through him or her shall in any way acquire any property or receive any benefit as the result of the death of the decedent * * * ." The statute forbids two groups from benefitting "as the result of the death of the decedent": (1) "slayer[s];" and (2) "any person claiming through [a slayer]." Id. (emphasis added). First, the statute does not simply forbid a slayer from receiving a benefit. Instead, it forbids a slayer from receiving a benefit "as the result of the death of the decedent." See id. (emphasis added). This occurs when a slayer takes under a will or by intestacy. This is simply not the case here. If Jennifer and Jeremy Swain were to take under a will and then transfer property to a slayer, the slayer would not receive that property "as the result of the death of the decedent." Rather, the slayer would benefit as a result of Jennifer and Jeremy Swain's disposal of their own property. That is clearly one step removed from the "death of the decedent."

Second, the beneficiaries in this case (Jennifer Swain and Jeremy Swain) do not fall into either category of prohibited beneficiaries as described in the clear language of § 33-1.1-2. They certainly are not slayers, and neither are they claiming "through" the slayer (their father David

-17-

Swain). Instead, Ms. Tyre named David Swain's children as specific beneficiaries in her will. It is noteworthy that the majority opinion concedes as much, expressly noting that "it is clear that plaintiffs are not claiming through the slayer." (Emphasis added.) The provisions of § 33-1.1-2 simply do not apply.

Although the General Assembly's mandate that the Slayer Act must be "construed broadly"[22] should certainly be respected, the word "broadly" is by no means a synonym of "limitlessly." This Court has previously stated that "[i]t is not the function of the Court to add language to an otherwise clear and unambiguous enactment." See State v. Fuller-Balletta, 996 A.2d 133, 143 (R.I. 2010); see also Little v. Conflict of Interest Commission, 121 R.I. 232, 237, 397 A.2d 884, 887 (1979). Moreover, a clause that reflects a legislative intent to apply a statute broadly "is not an invitation to apply [that statute] to new purposes that [the legislature] never intended." See Reves v. Ernst & Young, 507 U.S. 170, 183 (1993). The majority's holding creates just such a "new purpose[ ]" by adding to the statute a third category of prohibited beneficiaries—viz., those persons who might opt to use what has by devise or legacy become their own property in a way that would confer a benefit on the slayer. These beneficiaries fall outside the two categories of prohibited beneficiaries named by the General Assembly. Therefore, we believe that the majority's holding departs from the plain and unambiguous language of § 33-1.1-2.

For these reasons, we respectfully dissent.

---

[22] General Laws 1956 § 33-1.1-15 reads: "This chapter shall not be considered penal in nature, but shall be construed broadly in order to effect the policy of this state that no person shall be allowed to profit by his or her own wrong."



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  Jennifer Swain et al. v. Estate of Shelley A. Tyre by and through James H. Reilly as Administrator d.b.n, c.t.a.

**CASE NO:**  No. 2009-297-Appeal.
(NP08-0405)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  December 13, 2012

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ.

**WRITTEN BY:**  Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**  Newport County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Edward C. Clifton

**ATTORNEYS ON APPEAL:**

For Plaintiffs:  Bernard A. Jackvony, Esq.

For Defendant:  Martin K. DeMagistris, Esq.